## OLIVER v. WATTS.

### 4-4740

Opinion delivered October 18, 1937.

*L. B. Smead,* for appellants.

*Gaughan, Sifford, Godwin & Gaughan,* for appellees.

BUTLER, J. From the decree of the court below dismissing the complaint for want of equity, this appeal is prosecuted. The vital question upon which this case turns is, what was the intention of the parties grantor and grantee at the time of the execution of an instrument in the form of a warranty deed, dated February 5, 1917, and duly recorded on or about that time, by which was conveyed a certain sixty-acre tract of land situate in Nevada county, Arkansas.

It is the contention of the appellants, Isaac and Mary Ann Oliver, the grantors in said deed, that same was executed to secure an indebtedness due the grantees, M. P. and T. J. Watts, merchants, doing business under the name of M. P. Watts & Brother. It is further contended that they remained in continued possession of the lands from the execution of the deed with the privilege of repaying the debt secured being, in that event, entitled to a reconveyance of the lands. These contentions are denied by appellees who assert that the purpose of the deed was as recited therein, the consideration of which was the payment of a debt of approximately $850 due by Isaac Oliver to the grantees and that the possession of the Olivers thereafter was permissive, with the privilege, however, of repurchasing the lands.

The testimony tending to support the conflicting contentions presents questions of fact only, for there is no dispute as to the applicable law. If, in fact, the warranty deed was but to secure an existing debt, it will be regarded in equity as a mortgage. The burden, however, rests upon the party claiming it to be such to establish that fact by clear and convincing testimony. The conveyance must be judged according to the intention of the parties. If there is a debt subsisting between them and it is the intention to continue the same, the deed is a mortgage; but, if the conveyance extinguishes the debt and the parties intend that result, a contract for resale at the same price does not destroy the character of the deed as an absolute conveyance. *Hayes* v. *Emerson*, 75 Ark. 551, 87 S. W. 1027; *Snell* v. *White*, 132 Ark. 349, 200 S. W. 1023.

The question, therefore, for our examination and decision is whether or not the decree of the trial court is against the preponderance of the evidence. If such is the case, the finding of the chancellor must be reversed; but where the evidence leaves in doubt upon which side falls its greater weight, we adopt the view of the chancellor and affirm.

About much of the history of the transaction out of which this litigation arises, there is no dispute. This is as follows: Isaac Oliver and his wife, Mary Ann, are aged negroes, the former claiming at the time his testimony was given to be ninety-four years old. Both are illiterate. They owned the sixty acres in controversy and lived upon it for many years and reared a family which in the course of time grew up and moved away leaving their aged parents in the dwelling house which was also growing old and becoming more and more delapidated. It is doubtless true, although disclosed only by inference, that the small field which was being cultivated kept pace with the dwelling in its deterioration. This field appears to have been about fifteen acres in area, though it may have been larger at one time. For much of the time, Isaac Oliver was furnished for his needs by Watts & Brother and, being unable to pay for his annual advances, gave his creditors mortgages from time to time, generally annually, to secure the balance due. This course of conduct continued from year to year until finally, on February 5, 1917, instead of executing a mortgage, Isaac and the wife executed a warranty deed with release of dower and homestead by the wife. The market value of the land was not in excess of $600. They continued to live together on the lands still being furnished their necessary supplies by Watts & Brother, secured by crop and chattel mortgages, but no longer by mortgage on the land until 1921, when Watts & Brother declined to furnish longer. About 1923, Mary Ann Oliver also took her departure and appears not to have lived with her husband, Isaac Oliver, since that time. The old man remained alone in the house until it became uninhabitable. He then began to live around with his children. Part of the time he stayed with his son,

Will, who lived upon a tract of land adjoining the sixty-acre tract in controversy and whose house was only a few hundred yards away from Isaac's dwelling, which was destroyed by fire about the year 1931. Since that date, the lands have been uninclosed with no improvements being made thereon.

In 1923, there seems to have been exploration for gas and oil in Nevada county. Isaac Oliver, evidently, thought he could get the money on leases with which to pay the amount of the debt existing at the time of the execution of the warranty deed. This appears to have been agreeable to the administrator of the estate of T. J. Watts, who was then deceased, and also to M. P. Watts, for, on May 11, 1923, J. C. Watts, the administrator, filed a petition in the probate court for authority to join with M. P. Watts in a deed conveying to Isaac Oliver (also known as Ike Pipkin) the 60 acres of land. The petition recited that the Watts had acquired title to the lands on February 5, 1917, and that later had resold the said lands to Oliver for the consideration of whatever indebtedness he might owe to the firm of M. P. Watts & Brother and that said Oliver took possession of the lands under the terms of the agreement of sale. In the same year, apparently to secure money for the repurchase of the lands, Oliver executed an oil and gas lease on the lands to Mr. Rumph. This lease was never recorded because Rumph believed it to be of no value. What money, if any, was paid by Rumph to Oliver is not shown by the evidence, further than the testimony of Oliver who stated that he paid the money received from Rumph to Mr. Watts, but did not know how much he received. The negotiation for the repurchase of the lands by Oliver in 1923 fell through because he was unable to raise the money. Later, in 1926, Oliver again approached Mr. T. E. Watts, one of the Watts heirs (T. J. Watts died in 1922 and M. P. Watts in 1930), with a view of again getting an agreement for the purchase of the lands. T. E. Watts had been attending to all of the business from 1923 or 1924. He again agreed that Isaac might retain the lands, but told him that he would no longer permit him to repurchase for the original debt

of $850, but would reserve, in addition, one-half interest in the minerals. It does not appear that, at that time, the oil and gas lease market was active. At any rate, Isaac again failed to take advantage of the offer. On February 11, 1927, Ike Pipkin who is the same as Ike Oliver, executed in the office of Gaughan & Sifford, an instrument in writing by which he attorned to M. P. Watts and the heirs of T. J. Watts by formally acknowledging that the possession retained since 1917 was by their consent and as a tenant. He agreed to retain possession during the year 1927 and to pay as rent the sum of $25 on or before the first of December, 1927. This instrument was witnessed by Maude Crawford, an employee in the office of Gaughan & Sifford.

Nothing more appears to have transpired regarding the sixty-acre tract until 1936. During that year, there seems to have been reasonable expectation that the tract in controversy and the lands in that immediate section were underlaid by, and valuable for, petroleum oil and natural gas. On June 20, 1936, the Watts heirs executed an oil and gas lease to Joe McMahon on thirty acres of the sixty at $5 per acre, and, on October 13, executed a similar lease to Allen J. Wright for another part of the sixty acres for much more per acre than the first lease —about $70 per acre. About this time a producing oil well was brought in and, on October 23, 1936, Mr. H. W. Aarnes went to the town of Magnolia in Columbia county where Oliver was living with one of his sons, and secured an agreement from him in writing, acknowledged before a notary public, to the effect that Oliver would execute an oil and gas lease and deed to one-half of the minerals under the sixty-acre tract in consideration of Aarnes' paying the indebtedness secured by "a certain mortgage" on the sixty acres. Shortly thereafter Oliver and his wife, W. H. Aarnes joining as one of the parties plaintiff, brought this suit.

As before noted, the grantees in the instrument executed February 5, 1917, have been dead for many years and now the only living witnesses to the immediate circumstances of the transaction are Isaac Oliver and his wife, Mary Ann. Regarding the execution of the instru-

ment in question, Oliver testified that he had been giving mortgages from time to time for a number of years, that it was his understanding that the mortgages were on his crops and he does not remember anything about a deed; that he would give a new mortgage every year and make a note for supplies and furnishings every time he gave a mortgage; that he never executed a deed to anybody that he knew of, or a mortgage secured by his land. He stated that since 1917 a crop had been made on the lands every year. In support of his contention as to his continued possession and cultivation of the premises, he introduced a purported rent note signed by one, Boto Young, before Thomas W. Moss, a notary public. Moss, before whom the instrument of February 5, 1917, was executed and acknowledged, prior to the giving of the testimony by Oliver, had been dead seven or eight years. Mary Ann Oliver, wife of Isaac, testified that she never at any time signed a paper which she knew was a deed; that she remembered signing mortgages to Mr. Watts. She stated that the land was farmed every year until the time she left in 1923.

Will Oliver, Isaac's son, testified that the lands had been worked in 1928 or '29 and that he, himself, had worked them for several years from 1931 down to and including 1936. He didn't state how much land was in cultivation except that for the last year it was about an acre and a half.

T. E. Blakley, a witness called by appellants, stated that two crops were made on the lands from 1917 to 1927; that the house was burned in 1930 or '31 and since that time the lands had been farmed one year—1935.

The testimony on behalf of the appellees tended to show that it was the custom of Watts & Brother, when land was taken over from their customers by deed, to allow them to remain in possession and to have a reasonable time in which to redeem it, usually from three to five years. As a rule rent notes were taken. T. J. Watts handled the transaction when Isaac Oliver executed the instrument of February 5, 1917, and it was the understanding that he was to have a reasonable time in which to repurchase, but no rent notes were taken

from Oliver. This testimony was given by Mr. T. E. Watts who testified also about the transactions relating to the efforts of Oliver to repurchase the lands. He stated that, in 1927, he was managing the business and thought enough indulgence had been shown Oliver. He, accordingly, sent for him, explained the situation and Oliver agreed to renounce any further interest in the lands and executed the agreement of February 11, 1927. Oliver signed the agreement with full knowledge of its content, the same having been fully explained to him.

The testimony on the part of the appellees relating to the possession and cultivation of the lands is to the effect that only small patches were cultivated, carried on in a desultory fashion with frequent interruptions in the point of time. It had the appearance to the passer-by as being a small abandoned farm. One witness, a geologist, who made a close and critical examination of the land, testified that he saw no sign of recent cultivation, except a small patch of about a half an acre lying next to Will Oliver's house. This examination was made some time in 1936.

With respect to the instrument executed February 11, 1927, Isaac Oliver testified in effect that he was taken by Mr. Watts to an office in Camden and told to sign a paper which had been written out by a young lady; that he signed it, but didn't know what it was.

Appellants argue that the foregoing evidence preponderates in favor of their contentions and against the decree of the trial court. They first stress the evidence as to the continued possession of Oliver after the date of the deed executed in 1917 and the fact that Oliver executed an oil and gas lease in 1923 with the apparent knowledge of the appellees and the proceedings in the probate court by which authority was sought to convey the lands to Oliver and the recitals therein as to the agreement existing between the grantors and the grantees and the desire of the administrator and the surviving partner to carry the same into effect. We see nothing in any of these transactions tending more strongly to support the contentions of the appellants than that of the appellees. There is no serious controversy as to

the right of Oliver to retain possession of the lands, but the difference is as to whether he retained possession as mortgagor or under a contract of purchase; nor does the execution of the lease to Rumph controvert the contention of the appellee, it and the petition to the probate court being apparently contemporaneous and supplemental transactions; and, if the money could have been secured, a deed would have been executed to Isaac Oliver which would inure to the benefit of his lessee, Rumph. The recitals in the petition do not contradict the contention of appellees, but rather support it—namely, that there had been an outright purchase of the lands, the satisfaction being the extinguishment of the debt of Oliver, and that he was placed in possession by the grantees with the right to repurchase. As we understand it, appellees have never contended otherwise. The right accorded Oliver was extended for at least a reasonable time and perhaps this was occasioned by one of the facts urged by appellants for reversal—i.e., that Oliver was an infirm, illiterate negro of advanced age, who had long been associated in a business way with the Watts and depended upon them for advice and trusted their fair-dealing.

We are of the opinion that the decree of the trial court can be upheld if it was based on the conclusion that the evidence was not sufficient to overturn the solemn recitals of the warranty deed, and that more than a reasonable time in which to exercise the right had elapsed since the verbal contract of repurchase was made.

Relating to the attornment of February 11, 1927, all the evidence is given by interested witnesses, that of Oliver being vague and nothing more than a simple denial of knowledge of the character of the instrument he signed, while that on the part of the appellees is more definite and certain. Certainly, more cannot be said of the evidence than that it is equally balanced. That being true, the decree of the chancellor must be sustained if it be based on the theory that whatever Oliver's rights may have been prior to February 11, 1927, he released those rights and thereafter the relation existing between the parties was that of landlord and tenant. It follows that

the decree of the trial court must be affirmed. It is so ordered.